UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
Kai S. Wells,                                              :
                                                          :
                          Plaintiff,                      :
                                                          :
            -against-                                     :
                                                          :
Commissioner of Social Security,                          :
                                                          :
                          Defendant.                      :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/2/22

**OPINION**

1:20-CV-10332 (KHP)

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Kai S. Wells ("Plaintiff"), represented by counsel, commenced this action against

Defendant, Commissioner of the Social Security Administration (the "Commissioner"), pursuant

to the Social Security Act (the "Act"), 42 U.S.C. § 405(g).  Plaintiff seeks review of the

Commissioner's decision that Plaintiff was not disabled under sections 216(i), 223(d), and

1614(a)(3)(A) of the Act from May 25, 2013, the onset date of her alleged disability, through

the date of the decision, November 27, 2019.

The parties submitted a Joint Stipulation ("J.S."), in lieu of motions for judgment on the

pleadings.  (ECF No. 27.)  For the reasons set forth below, the Court GRANTS Plaintiff's motion

and DENIES the Commissioner's motion.

**BACKGROUND**

Plaintiff, who was born on August 8, 1970, is originally from New York, but moved to

Maryland.  (A.R. 190.)  Plaintiff revealed during the administrative hearing that while in

Maryland she was in a relationship with someone who stabbed and beat her.  (*Id*.)  She decided

to flee Maryland and move back to New York with her son, who is now 26 years old.  (*Id*.)

When Plaintiff returned to New York, Plaintiff placed her son with a family and put herself "in

the system to get shelter and housing." (*Id*.)  In the process of doing that, Plaintiff went back to work and college.  (*Id*.)  Plaintiff has a GED and an associate's degree with a health information technology specialty.

Plaintiff's prior employment included working as a stock supervisor.  In that role she supervised a team of approximately nine people who sorted through mail by zip code, organized the mail into boxes, and wrapped the boxes, after which Plaintiff drove a forklift with the boxes of mail to trucks so it could be delivered.  Plaintiff's responsibilities also included some computer work.  Plaintiff testified that at some point during her schooling, she began experiencing health issues, which included a C4 fracture in her neck and a fracture in her shoulder.  Plaintiff also has significant mental health issues.  The plaintiff worked in 2013 and 2014 but did not earn enough to constitute substantial gainful activity.  Additionally, plaintiff worked as a part-time security guard in 2017 for several months but also did not earn enough for it to constitute substantial gainful activity.  Plaintiff also volunteered for Catholic Charities three days a week for a period of time.

### 1.  *Procedural History*

On September 27, 2017, Plaintiff filed a Title II[1] application for a period of disability and disability insurance benefits.  Plaintiff also protectively filed a Title XVI application for supplemental security income on October 3, 2017.  Both of Plaintiff's claims were initially denied on December 7, 2017.  At Plaintiff's request, a hearing before an Administrative Law

---

[1] Persons are entitled to receive disability insurance benefits under Title II of the Social Security Act if the Secretary finds them disabled within the meaning of the Act and they otherwise qualify for insured status.  42 U.S.C. § 423.

Judge ("ALJ") was held on February 13, 2019 and June 5, 2019.  However, on both occasions Plaintiff requested a continuance to obtain a representative, which the ALJ granted.  On September 18, 2019, a video hearing before ALJ Andrea Addison was held.  Plaintiff appeared *pro se*, apparently unable to secure an attorney.  Vocational Expert ("VE") Tracey Wilkerson also testified at the hearing about Plaintiff's ability to do her prior work and other jobs in the national economy.

On November 27, 2019, ALJ Addison denied Plaintiff's application for benefits.  Plaintiff then retained counsel and requested review of the ALJ's decision by the Appeals Council on January 7, 2020.  Her counsel submitted new information in connection with this application that included a Psychological Impairment Questionnaire from a treating Nurse Practitioner dated January 29, 2020, a Narrative Report from a consultative examiner concerning her mental health, and a Psychiatric Impairment Questionnaire from that same examiner, as well as other records post-dating the hearing pertaining to physical impairments.  The Appeals Council denied review on October 9, 2020, making the ALJ's decision the final Agency decision.  The Appeals Counsel explained that the additional evidence submitted did not relate to the period 2013 through the date of the ALJ's November 27, 2019 decision and thus declined to review the ALJ's decision.  No further explanation was provided for rejecting the new assessment from Plaintiff's treating Nurse Practitioner.

Plaintiff then commenced this action on December 8, 2020.  The parties submitted a Joint Stipulation ("J.S.") in lieu of cross-motions for judgment on the pleadings (*Id.*), pursuant to this Court's Order at ECF No. 13.  Plaintiff argues that (1) the ALJ failed to develop the record

3

and failed to properly evaluate the medical opinion evidence; (2) that the Appeals Council erred

by failing to consider new and material medical evidence, and (3) the ALJ failed to properly

evaluate Plaintiff's testimony.  (ECF No. 27.)

    **2.  *The Commissioner's Decision***

The ALJ followed the five-step sequential evaluation process described in the Social

Security Regulations for determining whether an individual is disabled.  20 C.F.R. §§

404.1520(a); 416.920(a).  ALJ Addison found that, at step one, Plaintiff met the insured status

requirements of the Social Security Act through March 31, 2014.  (A.R. 13.)  At step two, the ALJ

determined that Plaintiff has not engaged in substantial gainful activity since May 25, 2013, the

alleged onset date.  20 C.F.R. §§ 404.1571 *et seq*., 416.971 *et seq*.

Then, ALJ Addison found that Plaintiff has the following severe impairments: back and

multiple joint disorders, hypertension, obesity, bipolar disorder, panic disorder, and

posttraumatic stress disorder, noting that these "impairments impose more than minimal

limitations regarding the claimant's overall functioning, as required by SSR 85-28."  (A.R. 14.)

The ALJ recognized that Plaintiff alleged she suffers from other symptoms of substance abuse

(at different times alcohol, cannabis, or cocaine), but found that these other symptoms are

either non-severe or non-medically determinable impairments and that at times during the

relevant period claimant reported remission, such that no symptoms of substance abuse were

present.  *Id.*

At step three of the sequential analysis, ALJ Addison determined the Plaintiff's

impairments did not meet or medically equal the criteria of Listings in 1.02, 1.04, 4.0, 12.04,

12.06, and 12.15, and also specifically analyzed the "paragraph B" criteria of the Listings related to Plaintiff's mental impairments.  (A.R. 14-16.)  In making the determination as to Plaintiff's mental impairments, ALJ Addison found that Plaintiff did not suffer from at least one extreme or two marked limitations in the listed mental functional areas.  (A.R. 17.)  Rather, ALJ Addison found that Plaintiff had a moderate limitation in all "paragraph B" criteria:  in understanding, remembering, and applying information, taking into account her activities of daily living that included caring for her personal needs, journaling and playing games on her phone, and that she manages her own finances; in interacting with others taking into account that she goes shopping on her own and maintains good relationships with family and a friend; in concentrating, persisting, and maintaining pace taking into account that she has a daily routine that involves a range of activities as mentioned above; and in adapting or managing herself for the same reasons mentioned above.  (A.R. 16.)  ALJ Addison also considered whether the "paragraph C" criteria for mental impairments were satisfied but found that the evidence failed to establish any "paragraph C" criteria because Plaintiff had no more than moderate limitations in her ability to adapt or manage herself.  (A.R. 17.)

While acknowledging her mental impairments and symptoms, the ALJ nonetheless concluded that Plaintiff retained the RFC to:

> Perform sedentary work . . . the claimant could occasionally climb ramps or stairs, but she should never climb ladders, ropes, or scaffolds. The claimant also could frequently handle and finger with her bilateral upper extremities, and that claimant could frequently reach in all directions with her dominant right upper extremity.  The claimant further needs a sit/stand option at will without going off task.  From a mental standpoint, the claimant can perform simple routine work with occasional and superficial interaction with coworkers and the general

public.  The claimant additionally can have occasional interaction with supervisors, and the claimant can deal with occasional changes in the work setting and routine.  The claimant also should never perform production pace work, but the claimant can make occasional work-related decisions.  The claimant further would be off task 5% of a shift due to her symptoms.

(A.R. 17.)  This assessment was based on a full review of Plaintiff's medical records, including treatment notes from Plaintiff's treating providers and her symptoms over time.  (A.R. 17.) ALJ Addison found that Plaintiff's description of the limitations caused by her impairments were not as intense, persistent, or functionally limiting as she testified at the hearing and not as limiting as her treating nurse practitioner or the Consultative Examiner found, both of whom opined that Plaintiff's mental health condition precluded working, relying primarily on the opinion of a 2017 state psychologist's report and the fact that Plaintiff's activities of daily living, including some temporary, part-time work.  (A.R. 18.)

At step five, ALJ Addison found that considering Plaintiff's age, education, work experience, and RFC, and relying on the VE's testimony, there are jobs "in significant numbers in the national economy that the [Plaintiff] can perform" such as addresser, document preparer, and call out operator.  (A.R. 26-27.)  Thus, ALJ Addison found that Plaintiff had not been disabled since May 25, 2013 through the date of the decision.  (A.R. 27.)

   3.  *Relevant Medical Evidence*

Plaintiff does not dispute the ALJ's findings regarding her physical impairments, therefore the following decision focuses only on Plaintiff's mental impairments and those medical providers.

### a. The Institute for Family Health[2]

Plaintiff received treatment from a variety of doctors, nurse practitioners, psychologists and social workers at the Institute for Family Health, located in walking distance from her home, from approximately February 9, 2015 through January 29, 2020.

Plaintiff sought weekly therapy from Vanessa Trujilio, L.M.S.W. from February 2015 through at least 2019.  From approximately February 9, 2015 through the end of July 2015, Plaintiff reported nervousness, anxiety, loss of interests, fear of meeting people, irritability, loss of energy, and helplessness.  (A.R. 684, 742, 801, 827, 858-59, 882-883.)  In the spring of 2015, Ms. Trujillo saw Plaintiff for psychosocial assessments and diagnosed Plaintiff with depressive disorder, alcohol abuse, cocaine abuse, and tobacco use disorder.  (A.R. 746.)  At the end of June 2015, Plaintiff reported that she felt nervous and anxious when she left her house, had racing thoughts, was easily distracted, had increased energy, and felt angry.  (A.R. 827-28.)  At this point, Ms. Trujillo diagnosed Plaintiff with bipolar disorder and post-traumatic stress disorder ("PTSD") and referred Plaintiff for a psychiatric evaluation.  (A.R. 829.)

On July 29, 2015, Plaintiff saw board-certified psychiatrist Elishka Caneva, M.D., who evaluated Plaintiff for symptoms of PTSD, depression, and obsessive-compulsive disorder.  (A.R. 905.)  Plaintiff reported she had nightmares, hypervigilance, become angry "very fast," had a depressed mood, loss of energy, paranoia, and sleep disturbances.  She also reported drinking alcohol and smoking cannabis three times a week.  (A.R. 905-06.)  Dr. Caneva diagnosed

---

[2] The Institute is an umbrella organization, encompassing Urban Horizons Family Health Center and the Walton Family Health Center and Center for Counseling, where Plaintiff sought treatment.

Plaintiff with PTSD, depression, and OCD.  (A.R. 907.)  Plaintiff continued therapy with Ms.

Trujillo, but her symptoms were essentially unchanged.  (A.R. 918, 929-30, 941, 954.)

On September 9, 2015, Plaintiff had a follow up appointment with Dr. Caneva.  She

reported that she continued to have anger and irritability, a depressed mood, feelings of

anxiousness about germs and nightmares, but was compliant with her medication.  At this

appointment, Dr. Caneva started Plaintiff on two additional medications to treat abnormal

moods, depression and anxiety – Lamictal and Lexapro (in addition to her Seroquel).  (A.R. 985.)

Dr. Caneva also set health objectives for Plaintiff which included abstaining from cocaine use

and reducing alcohol consumption.  (*Id*.)

In October of 2015, Plaintiff was seen by Ms. Trujilio and Dr. Caneva.  (A.R. 1034, 1072.)

Mental status examinations revealed continued anger and irritability, avoidance of people and

self-isolating.  (A.R. 1072.)  Dr. Caneva increased Plaintiff's dose of Lamictal and Seroquel and

stopped Lexapro.  (A.R. 1072.)  Shortly thereafter, Plaintiff discontinued use of Lamictal

because it caused rashes.  (A.R. 1086.)

In December of 2015, Plaintiff reported to Dr. Caneva that her mood was stable but

reported significant weight gain and compulsive behavior entailing excessive cleaning.  (A.R.

1200.)

On January 22, 2016, Plaintiff reported to Dr. Caneva that she felt angry, anxious, and

depressed.  (A.R. 1275.)  Subsequent notes from Ms. Trujillo and treating psychiatrist Dr.

Caneva dated through November 27, 2017, reflect Plaintiff's individual therapy treatments for

diagnoses of bipolar disorder, PTSD, and OCD.  (A.R.  1318-1319, 1343-1344, 1364-1366, 1398-

1400, 1422-1424, 1435-1436, 1448-1449, 1476-1477, 1522-1523, 1558-1559, 1591-1592, 1673-1675, 1704-1706, 1775-1777, 1817-1823, 2072-2074, 2356-2358, 2569-2571, 2585-2588, 2650-2652, 2701-2703, and 2848-2850.)  In general, these notes indicate similar symptoms as described above, but with intermittent periods of improvement.

During her treatment, Plaintiff began volunteer work at Catholic Charities.  In May of 2016, Plaintiff reported that she felt less angry, anxious, and depressed when she was volunteering.  (A.R. 1461.)  Plaintiff also noted feeling more stable with her continued medication of Lamictal, Seroquel, and Zoloft.  (A.R. 1462.)   However, from September of 2016 through May of 2017, Plaintiff's symptoms worsened, and she reported symptoms of anxiety, anger, and depression and admitted to using alcohol and cannabis notwithstanding her doctor's recommendation to discontinue or reduce using these substances.  (A.R. 1752, 1885, 2197.)

On September 20, 2017, Plaintiff saw Ramzi Kakish, L.M.S.W., for individual therapy. (A.R. 2520.)  Plaintiff reported a depressed mood and difficulty controlling thoughts of suicide, which often caused her to stay at home.  (A.R. 2521.)  Plaintiff described a recent suicide attempt thwarted by her boyfriend.  Mr. Kakish recommended going to the hospital for a psychiatric evaluation and submitted an incident report.  (A.R. 2521.)

On October 5, 2017, Alexander Peguero-Medrano, P.M.H.N.P., evaluated Plaintiff. Plaintiff reported feeling overwhelmed, anxious, empty and alone, and manic symptoms with cleaning.  (A.R. 2602.)  She also described having problems in crowded places and panic attacks on the train and in enclosed spaces.  N.P. Peguero-Medrano diagnosed Plaintiff with bipolar

9

disorder, OCD, marijuana use, crack use, PTSD, history of suicidal ideation with intent and plan, and panic attacks.  (A.R. 2605.)  At the time, it appears Plaintiff was still seeing her regular therapist, Ms. Trujillo, but had stopped her medications and, thus, was referred to N.P. Peguero-Medrano to resume a drug regimen to treat her mental health conditions.  (A.R. 2602, 2604-2605.)  He noted that at this time Plaintiff was experiencing a moderate depressive episode.  (A.R. 2607.)

In general, medical records, including the results of mental status examinations, dated from June 2014 through November 2019 from a variety of Plaintiff's treating providers at the Institute including Vanessa Trujillo, L.M.S.W.; psychiatrist Elishka Caneva, M.D.; Scott Gordon Chudnoff, M.D.; Vikas Mehta, M.D. paint a picture of an individual who struggled with mental health issues and had ups and downs.  At times they indicate Plaintiff had mild to moderate impairments and noted average intelligence, normal cognition, cooperative attitude, normal thought content, intact thought process, intact insight and judgment, and that Plaintiff was intermittently depressed, anxious, or irritable affect during the five-year time period.  (*See* A.R. 745, 801, 941, 997, 1072, 1200, 1476, 1544, 1591, 1705, 1752, 1886, 2198, 2604, 2701, 3141, 3152.)  At other times Plaintiff's condition worsened and she did attempt suicide.   For example, in July of 2015, Plaintiff's mental status examination revealed a severely depressed mood with passive suicidal ideations.  (A.R. 858.)  From March 2, 2016 through November 27, 2017, Plaintiff's mental status examinations revealed a depressed/ anxious and very angry moods with suicidal ideations.  (A.R. 1319, 1398, 1558-1559, 1591, 1776, 1823, 2072, 2356, 2569, and 2651.)  In July of 2016, Plaintiff became so angry, she pulled a knife out at her

boyfriend.  (A.R. 1543.)  Also, on May 24, 2017, Plaintiff reported depression with suicidal

ideations and a plan to overdose.  (A.R. 2198.)  A couple months later, on September 20, 2017,

Plaintiff described a recent suicide attempt.  (A.R. 2521.)

On January 17, 2019, N.P. Peguero-Medrano completed a Report for Claim of Disability

due to Mental Impairment summarizing Plaintiff's mental conditions.  He reported Plaintiff had

been treated since October 5, 2017 for bipolar II disorder.[3]  (A.R. 3122.)  N.P. Peguero-Medrano

opined that Plaintiff had "marked" limitations in her ability to understand, remember, and

apply information and to concentrate, persist, and maintain pace; and that she had "moderate"

limitations in her ability to interact with others and adapt or manage herself.  (A.R. 3125-26.)

He indicated that Plaintiff might be off-task at work about 50-75% of the workday due to

mental impairments.  (A.R. 3129.)  He explained that Plaintiff had panic attacks while on public

transportations, struggled with concentration/attention, and was drowsy from her medication

(Seroquel).  (A.R. 3123-3124.)

### b. Daniel Cohen, Ph.D. – SSA Consultative Psychologist

At the request of the Social Security Administration, Dr. Cohen evaluated Plaintiff on

November 8, 2017.  (A.R. 533.)  Plaintiff reported symptoms of difficulty sleeping, depression,

fatigue, low motivation, social withdrawal, frequent feelings of hopelessness, difficulty

concentrating, and increased anxiety in crowded places.   (A.R. 553-554.)  A mental status

examination revealed restless motor behavior with frequent light twitching and rocking, and

anxious and depressed affect with frequent crying and mildly impaired attention, concentration

---

[3] Plaintiff's treatment with the Institute for bipolar disorder actually went back to 2016 as noted above.

and memory skills.  (A.R. 555-556.)  Dr. Cohen diagnosed Plaintiff with bipolar disorder, panic

disorder, PTSD, cocaine use, and cannabis use.  (A.R. 557.)  Dr. Cohen noted that Plaintiff had

coherent and goal directed thoughts with no evidence of hallucinations, delusions, or paranoia.

*Id*.  He also found that she exhibited mildly impaired attention/concentration and memory

functioning, had average cognitive functioning, fair judgment and good insight.  *Id*.  He noted

she could perform simple calculations, could remember number sequences, exhibited an

appropriate funds of knowledge.  *Id*.  In assessing her limitations, Dr. Cohen found that Plaintiff

did not have any limitations in her ability to understand, remember or apply simple directions

and instructions, maintain personal hygiene and appropriate attire, and be aware of normal

hazards and take appropriate precautions; but Dr. Cohen opined Plaintiff had "marked"

limitations in her ability to regulate emotions and control behavior and maintain well-being;

"moderate to marked" limitations in sustaining an ordinary routine and regular work

attendance; "moderate" limitations in using reason and judgment to make work-related

decisions and interacting adequately with supervisors, coworkers, and the public, and "mild"

limitations in understanding, remember, and applying complex directions and instructions

sustaining concentration and performing at tasks at a consistent pace.  (A.R. 556-557.)  He

noted the results of his evaluation were "consistent with psychiatric, substance abuse and

cognitive problems which may significantly interfere with the claimant's ability to function on a

daily basis."  (A.R. 557.)  He indicated that at the time of the examination she had depressive

symptoms daily including crying spells, fatigue and low motivation.  She also had anxiety-

related symptoms daily including difficulty concentrating and avoidance of social settings as

well as panic attacks about four times per week.  (A.R. 553-554.)  He reported manic symptoms occurred "most days" including psychomotor agitation such as rocking and gesticulating and irritability leading to arguments with others.  (A.R. 554.)

### c.   M. D'Ortona, Psy.D. – State Agency Psychologist

Plaintiff was seen by Dr. D'Ortona on November 27 and 28, 2017.  The state agency psychologist indicated that although a medically determinable impairment was present in Plaintiff, it did not satisfy the criteria of the listings.  (A.R. 253, 259.)  Specifically, Dr. D'Ortona found that Plaintiff had a mild limitation in understanding, remembering, or applying information and moderate limitations in interacting with others, concentration, persistence and maintaining pace and adapting or managing oneself.  (A.R. 253.)  As a result, Dr. D'Ortona arrived at the conclusion that Plaintiff "retain[ed] the ability to perform the basic mental demands of unskilled work."  (A.R. 253-254, 259.)

### d.   Shauna Roach, P.M.H.N.P. Urban Horizons Family Health Center (under the umbrella of Institute of Family Health)

On January 29, 2020, Plaintiff was seen by Shauna Roach, P.M.H.N.P., who also submitted a psychiatric/psychological impairment questionnaire for Plaintiff.  (A.R. 62.)  Ms. Roach indicated that Plaintiff had continued with weekly therapy and monthly medication management visits at the Institute and opined that Plaintiff's most frequent and/or severe symptoms were irritability, sleep disturbance, intense and unstable relationships, depressed mood, and agoraphobia.  (A.R. 64.)  She also noted clinical signs and symptoms supported diagnoses of suicidal ideation and past suicide attempts.  (A.R. 62.)  She also noted Plaintiff showed hostility/irritability, intense and unstable interpersonal relationships, pathological

dependence, passivity or aggressiveness, easy distractibility, social withdrawal and isolation, and recurrent panic attacks. (A.R. 63.) N.P. Roach found Plaintiff had "marked" limitations in her ability to perform activities within a schedule and be punctual, work in coordination with others, make simple work-related decisions, perform at a consistent pace, and interact appropriately with the public. (A.R. 65.) Overall, N.P. Roach found that Plaintiff had good days and bad days, and that her symptoms and limitations were consistent with documentation of Plaintiff's conditions since she began treatment at the Institute for Family Health. (A.R. 66.) Ms. Roach's report was submitted to the Appeals Council.

### e. Christina Nicole Ryser, Ph.D. – Examining Psychologist

On May 12, 2020, Dr. Ryser evaluated Plaintiff's symptoms of sadness, loss of interest, decreased sleep, low energy, difficulty concentrating, feelings of guilt and worthlessness, persistently elevated and angry moods, and indecisiveness. (A.R. 157-58.) Plaintiff admitted to drinking alcohol and smoking marijuana but said that she has abstained from cocaine since 2019. (A.R. 162.) Plaintiff reported her history of suicide attempts, depression and episodes of anxiety. (A.R. 158-159.) A mental status examination by Dr. Ryser revealed paranoid thought content, depressed affect, limited memory skills, and poor concentration skills. (A.R. 162-164.) Dr. Ryser diagnosed Plaintiff with bipolar disorder, PTSD, panic disorder, alcohol use disorder, cannabis use disorder, and cocaine use disorder. (A.R. 164.) Dr. Ryser reaffirmed Plaintiff's diagnoses in a Psychiatric/ Psychological Impairment questionnaire where she noted that Plaintiff had "marked" limitations in her ability to understand, remember and carry our detailed instructions, maintain attention and concentration for periods of time, work with or near

others, complete a workday, accept instructions and travel by public transportation; "moderate-to-marked" limitations in work-like procedures, perform activities within a schedule, sustain ordinary routine without supervisions, perform at a consistent pace, request assistance, make plans, maintain socially appropriate behavior and respond appropriately to workplace changes.  (A.R. 166.)  Dr. Ryser's narrative report and psychiatric impairment questionnaire, both dated May 12, 2020, were also submitted to the Appeals Council.

## DISCUSSION

### 1. *Standard of Review*

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation *Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."); *id*. § 1383(c)(3) ("The final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) . . .").

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Even where the administrative record may also adequately support contrary findings

on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted).

Whether the ALJ has met her duty to develop the record is a threshold question which the Court must determine before reviewing whether the Commissioner's final decision is supported by substantial evidence. *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 261 (S.D.N.Y. 2016). "[T]he social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citations omitted). It is the ALJ's duty "to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Id.* at 112-13.

Additionally, when a disability claimant is unrepresented – as Plaintiff was here– the ALJ's duty to develop the record is "heightened." *Corporan v. Comm'r of Soc. Sec*. 2015 WL 321832, at *3 (S.D.N.Y. Jan. 23, 2015) (citing *Cruz v. Sullivan*, 912 F.2d at 8, 11 (2d Cir. 1990)); *see also* 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A) (the ALJ's duty to develop the record remains regardless of whether the claimant is represented by counsel.) When a claimant appears pro se, the ALJ must "scrupulously and conscientiously prove into, inquire of, and explore for all the relevant facts." *Cruz,* 912 F.2d at 11 (punctuation omitted). Furthermore, "it is self-evident that courts should exercise an extra measure of caution when adjudicating the claims of a litigant whose mental capacity is in question." *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 514 (2d Cir. 2002). Accordingly, the duty to develop the record is "doubly

16

heightened" where a claimant is both unrepresented and alleges mental impairments, as occurred here. *Rosa v. Comm'r of Soc. Sec.,* 2018 WL 5621778, at*10 (S.D.N.Y. Aug. 13, 2018), *report and recommendation adopted*, 2018 WL 4771531, at *1 (S.D.N.Y. Oct. 3, 2018).   This Court, too, must undertake a "searching investigation of the record" to make good the claimant's right to "a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980).

### 2. *Analysis*

Plaintiff argues that the ALJ failed to properly evaluate the medical evidence and the Appeals Council erred by failing to consider new and material medical evidence substantiating Plaintiff's disability.

A request for Appeals Council review of an ALJ's decision is the fourth and final stage in the administrative process of adjudicating claims for benefits under the Social Security Act. *See Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996).  Social Security regulations expressly authorize a claimant to submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision.  20 C.F.R. §§ 404.970(b), 416.1470(b).  "The Appeals Council will review a case if . . . the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision," provided that the claimant can make a showing of "good cause" as defined in the regulation (i.e., good cause for it not having being offered earlier).  See 20 C.F.R. § 404.970(b); accord 20 C.F.R. § 416.1470(b); *Lisa v. Sec'y of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).

"'New' evidence is any evidence that has not been considered previously during the administrative process that is not cumulative." *Samantha D. v. Comm'r of Soc. Sec.*, 2020 WL 1163890, at *4 (N.D.N.Y. Mar. 11, 2020) (citation omitted).  New evidence is "material" if it is: (1) relevant to the claimant's condition during the time period for which benefits were denied and (2) probative. *Stratton v. Colvin*, 51 F. Supp. 3d 212, 218 (N.D.N.Y. 2014) (quoting *Pollard v. Halter*, 377 F.3d 183, 193 (2d. Cir. 2004).  The concept of materiality requires a reasonable possibility that the new evidence would have influenced the Commissioner to decide the claimant's application differently.  *Pollard*, 377 F.3d at 193; 20 C.F.R. § 404.970(a)(5)(requiring a showing that "there is a reasonable probability that the additional evidence would change the outcome of the decision").  In the Second Circuit, the new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision.  *Perez*, 77 F.3d 41, 45 (2d Cir. 1996).  The court reviews "the entire administrative record" (including the new evidence) to determine whether "there is substantial evidence to support the decision of the Secretary." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015 (citing *Perez*, 77 F.3d at 46; 42 U.S.C. § 405(g)).

Here, the Appeals Council declined to review the ALJ's decision because the evidence submitted post-dated the ALJ's decision.  (A.R. 1-4.)  Thus, it viewed the submissions as immaterial to the ALJ's decision.  However, the records from N.P. Roach indicate that Plaintiff was seen weekly for therapy and monthly for psychiatric appointments from her treating provider continuously since 2015.  Thus, her report covers the period February 2019 through

18

January 2020, which would include nearly nine months of treatment before the ALJ's decision. That is, while the functional capacity questionnaire was completed after the ALJ issued her opinion, it was based on records pre-dating the opinion.  Accordingly, this evidence is related to the relevant time period, contrary to what the Appeals Council stated.  *See Shrack v. Astrue,* 608 F. Supp. 2d 297, 302 n. 2 (D. Conn. Apr. 1, 2019) (noting that, although the treating physician's opinion was dated after the ALJ's decision, it relied on notes composed during the relevant time period, and ordered that to "the extent that the findings and conclusions discussed in [the treating physician's] letter can be attributed to his observations during the time period at issue, that letter is new and material evidence and should be addressed on remand"); *Flagg v. Colvin,* No. 5:12–CV–0644, 2013 WL 4504454 at *5 (N.D.N.Y. Aug. 22, 2013) (rejecting the argument that the Appeals Council may properly dismiss a physician's opinion solely because it was completed after the date of the ALJ's decision), *Amanda L.C. v. Comm'r of Soc. Sec.,* 2020 WL 4783169 (N.D.N.Y. Aug. 18, 2020) (Appeals Council erred in finding doctor's opinion was not related to the relevant time period merely because it was rendered after the ALJ's decision); *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004) (recognizing new evidence consisting of documents generated after the ALJ rendered his decision can have a bearing on the Commissioner's evaluation of claims).  Dr. Ryser examined Plaintiff after the ALJ issued her decision but offered a retrospective opinion.  A retrospective opinion covers the relevant period and can be given some weight in assessing a claimant's residual functional capacity, particularly when there is nothing in the record that contradicts the retrospective opinion.  *Roy v. Apfel*, 201 F.3d 432 (2d Cir. 1999); *Monette v. Astrue*, 269 F. App'x 109, 113 (2d Cir. 2008).

Thus, it too should have been considered as related to the relevant time period to the extent it contains information not contradicted in the record.

Because it viewed the new evidence as not relating to the relevant time period, the Appeals Council did not review the ALJ's decision with the benefit of the new evidence. It did not reach the question of whether there is a reasonable probability that the new evidence would change the outcome of the ALJ's decision—a question it should have addressed for new evidence pertaining to the relevant period. The new evidence from N.P. Roach states that Plaintiff would be absent two to three days per month. Similarly, Dr. Ryser's opinion states Plaintiff would likely be absent from work more than three days per month. (A.R. 170) Notably, the ALJ does not appear to have developed the record on the number of times Plaintiff's mental health conditions would cause her to be absent in a month and how such absences would affect her ability to work. N.P. Peguero-Medrano responded "unknown" to the question about monthly absences on the questionnaire. (A.R. 3129.) The information about the number of days Plaintiff would likely be absent from work each month has a reasonable probability of changing the outcome of the ALJ's decision, as three or more absences per month can preclude gainful employment. *Saunders v. Colvin*, 93 F. Supp.3d 179, 186 (W.D.N.Y. 2015) (there is ample authority that absences of three or more days per month preclude gainful employment). See also *Mendez ex rel. E.V. v. Astrue,* No. 11–CV–4297, 2013 WL 1686485, at *10 (E.D.N.Y. Apr. 18, 2013) (quoting *Carballo ex rel. Cortes v. Apfel,* 34 F. Supp. 2d 208, 223 (S.D.N.Y.1999) ("Evidence developed after the ALJ's decision can be material if it 'shed[s] light on the seriousness of the claimant's condition at the time of the ALJ's decision.'"). Thus,

20

remand is appropriate to consider how this information impacts Plaintiff's ability to engage in substantial gainful employment.  See *Lesterhuis v. Colvin*, 805 F.3d 83, 89 (2d Cir. 2015) (remanding because Appeals Council failed to provide analysis of new and material medical opinions).

With respect to whether the Plaintiff showed good cause for failing to submit the new information to the ALJ, the Court notes that a claimant's pro se status can establish good cause, particularly when the claimant was reliant on the ALJ to develop the record.  *Jones v. Sullivan*, 949 F.2d 57, 61 (2d Cir. 1991); see also *Lakeisha H. v. Comm'r of Soc. Sec. Admin*., 2021 WL 1206549 (N.D.N.Y. Mar. 31, 2021) (Where there was a failure to develop the record and the plaintiff was pro se, good cause can be shown); *Smith v. Comm'r of Soc. Sec.,* 2014 WL 3392336, at *12 (N.D.N.Y. July 10, 2014) (finding good cause for *pro se* Plaintiff where Plaintiff tried to submit new evidence that was not available at the time.).  As noted above, the ALJ did not develop the record as to the number of days Plaintiff would be absent.  Insofar as Plaintiff was pro se and the ALJ was under a duty to develop the record on the impact of Plaintiff's impairments on her functional capacity, there is good cause for accepting the new evidence.  Indeed, a failure to develop the record is an independent basis to remand.  *Moran v. Astrue*, 569 F.3d 108, 114-115 (2d Cir. 2009); see also *Skartado v. Comm'r of Soc. Sec*., 20-cv-3909, 2022 WL 409701 (E.D.N.Y. Feb. 10, 2022) (remanding and directing ALJ to clarify whether plaintiff's likely absences from work and estimated "off-task" time are compatible with the RFC determined by the ALJ and inquire of the VE about how this affects employability).

In addition to the above, when reviewing the entire record, including the evidence submitted to the Appeals Council, I find that substantial evidence does not support the ALJ's decision.  Here, the ALJ appears to have conformed the RFC determination of moderate limitations based on state psychologist Dr. D'Ortona's report from November 27 and 28, 2017. While it is true that a non-examining state psychologist's opinions can be substantial evidence, in this case Dr. D'Ortona did not have the benefit of reviewing records from Plaintiff's treating doctors in 2018 and 2019.  Plaintiff's treating providers indicate that Plaintiff would be off-task a much higher amount of time each day in light of not only panic attacks but also poor concentration/attention (A.R. 3123-3124).  N.P. Peguero-Medrano, who treated Plaintiff for at least 2 years, indicated that Plaintiff might be off-task at work about 50-75% of the workday due to mental impairments.  (A.R. 3129.)  Dr. Cohen, who examined Plaintiff in 2017, found Plaintiff would have problems maintaining a routine and controlling emotions and behavior (A.R. 557).  Dr. Cohen opined that Plaintiff's symptoms would "significantly interfere with the claimant's ability to function on a daily basis."  (A.R. 557.)  The ALJ discredited these opinions, relying principally on Dr. D'Ortona's two-year old opinion and finding that Plaintiff would be off-task 5% of the workday.  The Second Circuit has cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination.  *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019).   Moreover, even Dr. D'Ortona stated Plaintiff's symptoms included "sustained concentration and persistence limitations."  (A.R. 254, 257.)  None of the medical providers suggested that Plaintiff would be off-task 5% of the day, and it is unclear how the ALJ arrived at that percentage.   Thus, substantial evidence does not support the ALJ's conclusion

that Plaintiff would be off-task only 5% of the workday.  This too requires remand because the amount of time Plaintiff is off-task each workday also affects her RFC and ability to engage in gainful employment.

In reaching an RFC, the ALJ relied heavily on the fact that Plaintiff was able to engage in some temporary, part-time work.  However, episodic part-time paid and volunteer work does not, by itself, establish that a person is able to engage in substantial gainful activity within the meaning of the Social Security Act.  *Melville v. Apfel*, 198 F.3d 45, 53-54 (2d Cir. 1999); *Meyers v. Astrue*, 681 F. Supp. 2d 388, 411 (W.D.N.Y. 2010).   The Court also notes that Plaintiff's temporary, part-time work is not inconsistent with the new evidence suggesting that Plaintiff would likely be absent from work three times per month due to her mental health conditions.

I do not reach the parties' arguments on whether the ALJ failed to properly assess the Plaintiff's testimony, because remand is appropriate for the reasons set forth above.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED, and Defendant's motion for judgment on the pleadings is DENIED.

Dated: May 2, 2022
      New York, New York

*Katharine H Parker*

KATHARINE H. PARKER
United States Magistrate Judge